[Docket No. 47]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

|  |  |
|---|---|
| MYCONE DENTAL SUPPLY COMPANY, INC., *d/b/a Keystone Industries*,<br><br>Plaintiff,<br><br>v.<br><br>GENERIC MANUFACTURING CORPORATION,<br><br>Defendant. | Civil No. 22-5791 (RMB/MJS)<br><br><br>**OPINION** |

**APPEARANCES:**

Gregory R. Sellers, Esq.
KLEHR HARRISON HARVEY BRANZBURG LLP
10000 Lincoln Drive East, Suite 201
Marlton, New Jersey 08053

    *On behalf of Plaintiff Mycone Dental Supply Company, Inc.* d/b/a *Keystone Industries*

Daniel J. Devlin, Esq.
VAN DER VEEN, HARTSHORN & LEVIN
1219 Spruce Street
Philadelphia, Pennsylvania 19107

    *On behalf of Defendant Generic Manufacturing Corporation*

**RENÉE MARIE BUMB, Chief United States District Judge:**

    **THIS MATTER** comes before the Court upon the filing by Plaintiff Mycone

Dental Supply Company, Inc. d/b/a Keystone Industries ("Plaintiff" or "Keystone")

of a Motion for Summary Judgment on its breach of contract claim against Defendant

Generic Manufacturing Corporation ("Defendant" or "Generic") pursuant to Federal Rule of Civil Procedure 56. [Pl.'s Sum. J. Mot., Docket No. 47; Pl.'s Br., Docket No. 47-1.] Defendant has opposed the motion. [Def.'s Opp'n, Docket No. 52.] And Plaintiff has filed a Reply Brief. [Pl.'s Reply Br., Docket No. 53.] As the Motion is now fully briefed, it is ripe for adjudication. For the reasons set forth below, Plaintiff's Motion for Summary Judgment will be **GRANTED**.

## I.    BACKGROUND

This is a straightforward breach-of-contract case with a tortured history.[1] During the COVID-19 pandemic, Plaintiff began manufacturing and packaging hand sanitizer, for which it required a specialized piece of machinery for its assembly line (the "Capping Machine"). The Capping Machine was to be used by Plaintiff "to apply

---

[1]    When this case was first filed, Defendant failed to timely respond, and the Clerk of the Court entered default against it on October 27, 2022. Defendant eventually appeared, opposed Plaintiff's motion for default judgment, and moved to set aside the Clerk's entry of default against it. [Docket Nos. 9, 10.] In denying Plaintiff's motion for default judgment and granting Defendant's motion to set aside the default, the Court cautioned Defendant that it did not condone its lack of diligence and that it would consider sanctions for any further delays. [Order at 14, Docket No. 13.] Defendant, it appears, did not heed this Court's warning. Defendant was dilatory throughout written discovery, requiring the Court to intervene on at least two separate occasions. [*See, e.g.*, Docket Nos. 22, 26.] The deposition of Lonnie Belts, Defendant's co-owner and designated corporate representative, was delayed and rescheduled for months on end, once again requiring Court intervention on multiple occasions. [*See, e.g.*, Docket Nos. 29, 32, 39, 42.] This was the *only* deposition taken by either party in this matter and yet discovery had to be extended four times to accommodate Defendant. When the deposition finally took place – on the very last day of the discovery period – Defendant was ill-prepared to testify as a Rule 30(b)(6) corporate designee. [*See* Belts Dep. Tr. 26:7-27:14, 33:2-17, Sellers Decl. Ex. 4, Docket No. 47-7.] Discovery has now concluded, and the case can finally come to a resolution. Enough is enough.

caps, pumps, and spray heads to various bottles of hand sanitizer after the bottles had been filled."  [Pl.'s Statement of Undisputed Material Facts ("SUMF") ¶ 3, Docket No. 47-2.]  On October 20, 2020, Defendant sent Plaintiff a quote for the building and shipping of the Capping Machine.  [*Id.* ¶ 2.]  Plaintiff sent Defendant a purchase order on October 23, 2020, which set forth the terms of the parties' agreement (the "Purchase Order").  [Purchase Order, Sellers Decl. Ex. 3, Docket No. 47-6.]

The Purchase Order provided the "Complete System Price" for the Capping Machine of $614,650.00 and a March 2021 due date for delivery of the Capping Machine.[2]  [SUMF ¶ 4.]  It also set forth a two percent penalty per week for late delivery, not to exceed ten percent of the purchase price (*i.e.*, $61,465.00).  [*Id.*]  Under the terms of the Purchase Order, the Capping Machine was subject to Plaintiff's inspection and approval and Defendant was to advise Plaintiff of any shipment delays.  [*Id.* ¶ 5.]  Defendant was responsible for sourcing all parts and components.  [*Id.*]  Finally, the Purchase Order required Plaintiff to pay fifty percent of the Complete System Price with the Purchase Order (the "Deposit") and the remaining fifty percent after successful acceptance testing and shipping of the Capping Machine.  [*Id.* ¶ 4.]  Plaintiff sent Defendant the Deposit of $307,325.00 along with the Purchase Order.  [*Id.* ¶ 6.]

---

[2]    The Court observes that the Purchase Order itself includes a "Delivery date" of "3/12/2021" at the top of each page, as well as a provision stating, "Lead time 18 – 20 weeks, due 3/21/2021."  [Purchase Order at 2.]  The Court assumes this is a typographical error and, given that the Capping Machine was never delivered at all, the inconsistency is immaterial to the Court's determinations.

Defendant did not ship the Capping Machine by March 2021. [*Id.* ¶ 7.] In fact, Defendant ***never*** shipped Plaintiff the Capping Machine at all. [Stewart Decl. ¶ 6, Sellers Decl. Ex. 2, Docket No. 47-5; Belts Dep. Tr. 19:2-14.] What transpired instead were a series of delays, change orders, and emails between the parties regarding the status of the Capping Machine.

On October 14, 2021 – roughly six months after the provided for due date – Dan Van Artsdalen, a Keystone project engineer, requested an update on the Capping Machine from Mr. Belts. [Progress Emails at KEY001383, Sellers Decl. Ex. 5, Docket No. 47-8.] A few days later, Mr. Belts responded, explaining that Generic was "struggling with supplies and personal [sic] like the rest of the nation," but "[i]f all goes as planned machine should be ready early November [2021]." [*Id.* at KEY001382–83.] On November 1, Mr. Van Artsdalen requested another update. [*Id.* at KEY001382.] Having apparently received no response, he wrote Mr. Belts again on November 8: "It's been over a year since you received the [Purchase Order] and collected over $300k of our money. Please give us an update." [*Id.* at KEY001381–82.]

On or about November 18, 2021, Mr. Van Artsdalen visited Defendant's facility to see the Capping Machine progress firsthand. [*See id.* at KEY001380–81; Belts Dep. Tr. 46:1-47:20.] Brett Snyder, a production manager at Defendant Generic, sent Mr. Artsdalen a progress report thereafter. [Progress Emails at KEY001380.] On November 29, Mr. Van Artsdalen emailed Mr. Belts asking if he had "gotten the junction boxes we talked about?" [*Id.*] Mr. Belts responded a few days later that it would take two to four weeks to receive them. [*Id.*] Mr. Van Artsdalen confirmed

4

that Defendant should proceed with the change order the next day. [*Id.* at KEY001379.]

Mr. Van Artsdalen followed up again on December 16: "Your schedule had everything being completed this week. How's it going?" [*Id.*] After receiving no response, he wrote again on January 6, 2022: "Lonnie, [I] need an update please. I'll give you a call today." [*Id.*] On January 10, Mr. Belts explained that he had been ill and was catching up on emails now, to which Mr. Van Artsdalen responded with a list of open items from his site visit in November. [*Id.* at KEY001378.] On January 21, Mr. Belts informed Plaintiff that the Capping Machine should be "ready in 2-3 weeks." [*Id.* at KEY001377.] That same week, Mr. Van Artsdalen requested a change to the parts used, which Defendant confirmed with a quote. [*Id.* at KEY001376; Last Change Order Quote, Sellers Decl. Ex. 8, Docket No. 47-11.]

On the morning of February 4, Mr. Van Artsdalen emailed Mr. Belts, and copied Robert Stewart, Senior Director of Global Operations and Facilities at Keystone, requesting an update on the Capping Machine. [Progress Emails at KEY001375–76.] That afternoon, he wrote again: "We really need a schedule on the machine! What's left to do?" [*Id.* at KEY001375.] After a month with no response, Mr. Stewart wrote directly to Mr. Belts on March 4: "I will be taking over the relationship with Resina to get the capper completed for delivery.[3] I need you to respond asap on the status of the machine and when you expect to complete for a FAT

---

[3]    Defendant Generic is on occasion referred to as "Resina" in the record.

test.  This deliver is more than 12 months late." [*Id.* at KEY001375.]  On March 7, Mr. Belts responded: "Currently we are awaiting a few items that are on backorder along with the change order on the electrical we are installing.  Estimated complete before end of the month." [*Id.* at KEY001374.]

Another month passed with no updates.  On April 6, Mr. Stewart reached out to Mr. Belts for an update again.  [*Id.*]  Nearly another month passed before Mr. Belts responded on May 2: "We have been doing testing on your machine and we should have some video for you to see this week." [*Id.* at KEY001373.]  Plaintiff had not received any videos by May 17 and wrote to follow up.  [*Id.*]  Mr. Belts responded on May 24 that some changes needed to be made after initial testing and that Generic "should be testing again next week.  Close to completion, video and soon F.A.T." [May 24, 2022 Email at KEY001362, Sellers Ex. 6, Docket No. 47-9.]  On June 15, Mr. Belts wrote again, explaining that Generic had been "awaiting components for the electronic gearing of the machine" that were on backorder and that he would provide an "update as soon as we have positive news." [Progress Emails at KEY001373.]  On June 28, Mr. Belts updated Mr. Stewart on the backordered components: "We will receive the drives 3 electronic cards required tomorrow.  Checking on three cables required should receive end of this week.  I will update in a few days." [Demand Emails at KEY001399, Sellers Decl. Ex. 7, Docket No. 47-10.]  No update was provided.

Plaintiff now involved its general counsel, Ira Rosenau.  Early on the morning of Tuesday, August 2, 2022, Mr. Rosenau wrote to Mr. Belts:

It is imperative that you contact me as soon as possible to discuss a resolution to this very serious situation concerning the capping equipment we ordered in 2020.

We have endured months and months of empty, broken promises from your company. You have held more than $307,000 of our money for nearly TWO YEARS without delivering the contracted-for equipment – this is beyond outrageous.

Keystone Industries is done with the excuses. We want to immediately arrange for the return of our deposit money – it is clear that Generic Manufacturing has breached its obligations to Keystone Industries and we have no confidence that the equipment will ever be delivered to us.

If we do not hear from you by the end of this week to arrange for the return of our funds, we will refer this matter to outside counsel and commence litigation.

[Demand Emails at KEY001398.] Mr. Belts did not respond until the evening of Friday, August 5: "Many things have delayed completion of your line, many out of our control." [*Id.* at KEY001397.] He proceeded to list several causes for Defendant's delays, including issues with samples, change orders, "world supply issues," and "backlog delays" due to the COVID-19 pandemic. [*Id.*] He continued: "[W]e will be testing the machine next week. We have spent way more than your deposit on the build and change orders for your line. We will continue to finish your line and it should be done shortly." [*Id.*]

At his deposition, Mr. Belts elaborated that the delays were due to Plaintiff's change orders, "world events" including the pandemic, staff illnesses, and pandemic-related supply chain issues, and personal issues. [Belts Dep. Tr. 23:10-24:18, 54:13-63:11]. Mr. Belts held the view that the deadline for delivery had been extended "indefinitely" due to these circumstances and that Generic was

only obligated to provide the Capping Machine to Plaintiff when it was ready, regardless of the original timeline set forth in the Purchase Order. [*Id.* 24:21-26:6, 30:11-25, 35:1-5, 41:10-42:18.]  However, he did not testify that Plaintiff ever acknowledged or authorized an extension of the delivery deadline. [*See id.* 28:2-23.]

On September 7, after receiving no further updates from Defendant, Plaintiff's general counsel wrote to Mr. Belts once again – this time copying outside counsel – and declared Defendant in breach of the parties' contract, terminated the agreement, and demanded the immediate return of Plaintiff's Deposit. [Demand Emails at KEY001396.]  Paul Nofer, Plaintiff's outside counsel, wrote Mr. Belts later that day reiterating Plaintiff's position. [*Id.*]  There is no evidence that Defendant responded to these emails.  And Defendant never returned Plaintiff's Deposit. [Belts Dep. Tr. 95:7-10.]  So Plaintiff commenced this action on September 30, 2022.

While awaiting the Capping Machine, Plaintiff continued manufacturing and packaging hand sanitizer.  Without the Capping Machine, however, Plaintiff has had to manually cap the hand sanitizer bottles by running a manufacturing assembly line with three operators for eight hours per day. [Stewart Decl. ¶¶ 11–12.]  The operators were paid $22.99 per hour. [*Id.* ¶ 12.]  Plaintiff ran 241 eight-hour shifts between September 2021 and November 3, 2022. [*Id.*]  By November 3, 2022, Keystone had paid $132,974.16 on labor costs to cap its hand sanitizer bottles manually. [*Id.* ¶ 13.]

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might impact "the outcome of the suit under the governing law." *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 261 (3d Cir. 2012). A dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party. *Id.*

The movant has the initial burden of showing through the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits "that the non-movant has failed to establish one or more essential elements of its case." *Connection Training Servs. v. City of Phila.*, 358 F. App'x 315, 318 (3d Cir. 2009). "If the moving party meets its burden, the burden then shifts to the non-movant to establish that summary judgment is inappropriate." *Id.*

In the face of a properly supported motion for summary judgment, the nonmovant's burden is rigorous. The nonmovant "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995); *accord Jackson v. Danberg*, 594 F.3d 210, 227 (3d Cir. 2010) ("[S]peculation and conjecture may not defeat summary judgment.") (citing *Acumed LLC. v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009)). Nor will bald assertions in a party's brief. *See Dabone v. Thornburgh*, 734 F. Supp. 195, 199 (E.D. Pa. 1990) ("[A]ssertions in briefs are not competent evidence unless agreed to by the adverse parties.") (citing *Braden v. Univ. of Pittsburgh*, 477 F.2d 1, 6 (3d Cir. 1973)).

In deciding whether there is a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable inferences and doubts should be resolved in favor of the nonmoving party. *Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010). However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Moreover, a court need not adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. *Scott v. Harris*, 550 U.S. 372, 380 (2007). In the face of such evidence, summary judgment is still appropriate "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Walsh v. Krantz*, 386 F. App'x 334, 338 (3d Cir. 2010).

Local Civil Rule 56.1(a) requires a party moving for summary judgment to include a statement of material facts not in dispute. The party opposing summary judgment must file "a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents." L. Civ. R. 56.1(a). "[A]ny material not disputed shall be deemed undisputed for purposes of the summary judgment motion." *Id.* "Where . . . a party fails to respond to the movant's statement of undisputed material facts with a point-by-point indication whether the stated fact is undisputed or, if disputed, with a precise citation to the factual record where contrary evidence exists, then the Court assumes that the opponent has no evidence raising a genuine dispute with the movant's

stated fact." *Grant v. Revera Inc./Revera Health Sys.*, No. CIV.A. 12-5857 JBS, 2014 WL 7341198, at *2 (D.N.J. Dec. 23, 2014); *see also* Fed. R. Civ. P. 56(e)(2).

As Plaintiff rightly points out, Defendant has failed to comply with Local Rule 56.1. [*See* Pl. Reply Br. at 2–3.] Defendant provides just boilerplate denials and cites only to the *entirety* of Mr. Belts's deposition transcript. [*See generally* Def.'s Resp. to SUMF, Docket No. 52-1.] Defendant clearly has failed to identify "with a precise citation to the factual record" any contrary evidence when disputing Plaintiff's statement of facts. *See Grant*, 2014 WL 7341198, at *2. The Court is entitled to treat Plaintiff's entire version of events as undisputed.

The Court is deeply troubled by Defendant's counsel's responses to Plaintiff's statement of undisputed material facts. To simply respond "denied as stated" for each statement of fact without setting forth what the material dispute is, let alone identifying the record evidence that establishes the genuine dispute, is unacceptable. Moreover, the Court has reviewed each statement of fact and the corresponding record evidence and finds no inaccuracies or inconsistencies between Plaintiff's characterization of the evidence and the evidence itself. The Court hereby admonishes counsel for his present failure to comply with the Local Rules.[4] The Court expects strict compliance with both the Federal Rules of Civil Procedure and the Local Rules in the future.

---

[4] The Court is likewise troubled by the extensive discovery delays in this matter, though it makes no findings as to where the fault lies for such delays. Counsel, however, is forewarned that all parties and counsel must act diligently, cooperatively, and in good faith throughout discovery and all subsequent stages of the litigation, lest they risk the imposition of further admonishments or sanctions.

In any event, the Court turns to and relies upon Plaintiff's statement of facts, the parties' motion papers, and the underlying record evidence in deciding whether summary judgment is appropriate here. *See, e.g., Jordan v. Allgroup Wheaton*, 218 F. Supp. 2d 643, 646 n.2 (D.N.J. 2002), *aff'd*, 95 F. App'x 462 (3d Cir. 2004). In doing so, the Court views the facts in Defendant's favor and gives it the benefit of all reasonable inferences. *See, e.g., Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014). The Court emphasizes, however, that "[t]he line between reasonable inferences and impermissible speculation is often 'thin,' but nevertheless is critical because 'an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." *Id.* (internal citation omitted).

## III.   DISCUSSION

Under New Jersey law, "[t]o state a claim for breach of contract, [Plaintiff] must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007); *Damiani v. CMG Mortg. Inc.*, No. 1:22-CV-04783-RMB-EAP, 2024 WL 2746086, at *12 (D.N.J. May 28, 2024).

The existence of a contract between the parties is undisputed. The parties entered into the Purchase Order for the Capping Machine on October 23, 2020. [SUMF ¶ 4; Purchase Order.] It is likewise undisputed that Plaintiff performed under the contract. Defendant makes no argument that it did not. The undisputed evidence

establishes that Plaintiff sent Defendant the required fifty percent Deposit of $307,325 along with the Purchase Order.  [SUMF ¶ 6.]

Plaintiff represents that it has suffered damages in the total amount of $501,764.16.  [Stewart Decl. ¶¶ 11–14.]  This comprises the full amount of its Deposit paid to and not returned by Defendant ($307,325), the contracted ten percent late penalty for failing to timely deliver the Capping Machine ($61,465), and Plaintiff's labor costs associated with manually capping hand sanitizer bottles ($132,974.16).  *Id.*

Defendant does not meaningful dispute Plaintiff's damages.  Defendant admits that Plaintiff paid it the Deposit of $307,325 and that it has not returned this amount to Plaintiff despite failing to deliver the Capping Machine.  [SUMF ¶ 6; Belts Dep. Tr. 16:11-18:9, 19:2-8.][5]  Additionally, Defendant does not dispute the existence or validity of the penalty provision of the Purchase Order.  [SUMF ¶ 4.]  "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party."  *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 330 (3d Cir. 2016) (quoting *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)).  Yet, perplexingly, Defendant does not even attempt to challenge the amount or type of Plaintiff's claimed damages and has made no effort to argue that Plaintiff's labor costs are improper.  Instead, Defendant baldly asserts that "[t]he deposition testimony of Lonnie Belts establishes that there is a

---

[5]    Defendant only proffers that the Deposit was not returned because it was spent on building the Capping Machine.  [Belts Dep. Tr. 19:5-8.]  But there is no evidence in the record to suggest that this excuses the return of the Deposit.  The undisputed record shows that Plaintiff paid Defendant over $300,000 for equipment that it never received.

genuine issue of material fact as to whether Defendant Generic is in breach of the Purchase Order, whether the Deposit should have been returned, and Keystone's damages allegedly suffered." [Def.'s Resp. to SUMF ¶¶ 24–26 (citing Belts. Dep. Tr. "*in toto*").] This is insufficient. As a result, the Court finds that there are no genuine issues of material fact as to Plaintiff's damages.

The final element that Plaintiff must establish is Defendant's breach. The record clearly establishes that Defendant failed to perform under the terms of the Purchase Order. The Purchase Order included a due date in March 2021, and a two percent penalty against Defendant per week for late delivery, not to exceed ten percent of the purchase price. [SUMF ¶ 4.] Yet the Capping Machine was not delivered by the agreed upon due date; in fact, it was never delivered at all. [SUMF ¶ 7; Belts Dep. Tr. 19:2-4.] Plaintiff declared Defendant in breach of the Purchase Order on September 7, 2022, almost eighteen months after the due date and thirty-one weeks since Plaintiff's last change order.[6] [Demand Emails at KEY001396; Last Change Order Quote.]

The source of the parties' dispute, however, is whether Defendant's obligations were excused or modified. Defendant contends that Plaintiff's change orders modified the terms of the contract and allowed Defendant an indefinite amount of time to complete and deliver the Capping Machine. Additionally, Defendant claims that its

---

[6]    The Purchase Order contemplated only a lead time of eighteen to twenty weeks for completion of the entire machine. [Purchase Order at 2.]

performance was excused under the doctrines of impossibility and impracticability. The Court addresses these arguments in turn.

### A.    Modification of Contract Terms

Defendant argues that it was excused from timely shipment of the Capping Machine because Plaintiff's "conduct during the course of engagement," namely its change orders, gave it an indefinite amount of time to complete the machine. [*See* Def.'s Opp'n at 2–3.]  Throughout the parties' relationship, Plaintiff requested numerous changes that required new parts to be ordered and additional work to be done on the Capping Machine.  [*See, e.g.*, Belts Dep. Tr. 27:15-31:25, 32:15-34:22, 41:1-42:10; Progress Emails at KEY001374, KEY001376, KEY001380; Last Change Order Quote.]  This is not disputed.  According to Defendant and Mr. Belts, however, Plaintiff's requested changes entitled Defendant to an indefinite amount of time to complete and ship the Capping Machine.  [*See, e.g.*, Belts Dep. Tr. 29:11-20, 30:20-31:15, 35:1-5.]

But Mr. Belts's testimony that Defendant could ship the Capping Machine whenever it was complete without consequence is nothing more than subjective belief and pure speculation.  "Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment."  *Churchill Downs, Inc. v. Ribis*, 499 F. Supp. 3d 82, 87 (D.N.J. 2020) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)); *Jackson*, 594 F.3d at 227 ("[S]peculation and conjecture may not defeat summary judgment.").

Defendant fails to cite any *evidence* to support this subjective belief.  Plaintiff states that Defendant "has done nothing to avoid summary judgment."  [Pl.'s Reply Br. at 1.]  The Court agrees.  Despite having no obligation to do so, the Court has scoured the record in this case and finds that there is simply no evidence that the contract's express terms – including the March 2021 deadline and late penalty provision – were ever modified.[7]

"Under New Jersey law, parties to an existing contract, by mutual assent, may modify their contract, and 'modification can be proved by an explicit agreement to modify, or . . . by the actions and conduct of the parties, so long as the intention to modify is *mutual and clear*."  *Merck & Co. v. KGAA*, No. CV160266ESMAH, 2022 WL 19521725, at *5 (D.N.J. Sept. 30, 2022) (emphasis in original) (quoting *Elliott & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 322 (3d Cir. 2006)).  An "[a]mbiguous course of dealing from which one party might reasonably infer that the original contract was still in force, and the other that it had been changed, will not support a modification."  *Cnty. of Morris v. Fauver*, 153 N.J. 80, 99–100 (1998) (internal quotation omitted).  Unilateral statements cannot modify the original terms of a contract "because knowledge and assent are essential to an effective modification."  *Id.* at 100.

---

[7]    Courts are "not required to scour the record to make the case of a party who did nothing."  *United States v. Stevenson*, 832 F.3d 412, 421 (3d Cir. 2016) (internal quotations, citations, modifications omitted); *accord Perkins v. City of Elizabeth*, 412 F. App'x 554, 555 (3d Cir. 2011) ("a court is not obliged to scour the record to find evidence that will support a party's claims."); *Dawley v. Erie Indem. Co.*, 100 F. App'x 877, 881 (3d Cir. 2004) ("Rule 56 does not oblige a district court to scour the entire record to find a factual dispute.").

While Mr. Belts believed the deadline should have been modified, there is no evidence in the record that Defendant ever requested a modification or that Plaintiff agreed to one. To the contrary, the documentary evidence utterly belies Mr. Belts's unilateral and subjective belief that the deadline had been modified. The final change order, for example, included no revised due date for the Capping Machine's completion.[8] [Last Change Order Quote.] What's more, the email correspondence between the parties clearly shows that Plaintiff did not agree to give Defendant an indefinite amount of time to perform under the contract. [*See generally* Progress Emails; Demand Emails.] Plaintiff regularly requested status updates and expressed concerns about the lengthy delay and Defendant's lack of diligent communication. [*See, e.g.*, Progress Emails at KEY0013783 ("Any update on the machine? You mentioned videos 2 weeks ago but I have not received anything?"), KEY001375 ("This deliver is more than 12 months late."), KEY001382 ("It's been over a year since you received the PO and collected over $300k of our money. Please give us an update."); Demand Emails at KEY001398 ("You have held more than $307,000 of our money for nearly TWO YEARS without delivering the contracted-for equipment – this is beyond outrageous.").]

Furthermore, the fact that Plaintiff continued to deal with Defendant for well over a year beyond the agreed upon deadline – after all, it seemed better late than never

---

[8]    Regardless, thirty-one weeks passed between the last change order and Plaintiff declaring Defendant in breach. Defendant's contention that this was acceptable – when the contract only contemplated a lead time of eighteen to twenty weeks – strains credulity.

– does not support a modification to the contract. *See CAN Cmty. Health, Inc. v. New Jersey Aids Servs., Inc.*, No. 2:23-CV-22376 (WJM), 2024 WL 2180363, at *4 (D.N.J. May 15, 2024) ("CAN's acceptance of $3,000 alone is not such clear evidence of an intent to modify EDGE's rent obligations."); *Fauver*, 153 N.J. at 101 (mere acceptance of lesser payments does not show mutual modification); *Aperion Enterprises, Inc. v. Gotham Beverage, Inc.*, No. A-1840-20, 2022 WL 3581585, at *6 (N.J. Super. Ct. App. Div. Aug. 22, 2022) ("in the absence of a properly modified contract, the fact that plaintiff accepted less rent than it was entitled to under the lease is not evidence of an intention to modify.").

The Purchase Order provides a definitive deadline for performance, as well as penalties for late delivery. If Defendant wanted the delivery date to be tentative, it could have bargained for different terms in the first instance or, at the very least, requested an extension of the delivery date. *See Corestar Int'l Pte. Ltd. v. LPB Commc'ns, Inc.*, 513 F. Supp. 2d 107, 122 (D.N.J. 2007). It did neither. The Court rejects Defendant's attempt to fabricate a genuine dispute of fact as to whether the Purchase Order's deadline had been modified. There is simply no evidence from which a jury could find a "*mutual and clear*" intention to modify the terms of the contract.

## B.    Impossibility or Impracticability

Alternatively, even if the contract's terms were not modified, Defendant contends that Plaintiff's change orders and certain challenges stemming from the COVID-19 pandemic, such as personnel shortages due to illness and global supply

chain backlogs, excused its performance under the doctrines of impossibility or impracticability.

"New Jersey courts recognize the contract doctrine of impossibility of performance as a defense to breach of contract claims." *Armur Realty, LLC v. Banco do Brasil, S.A.*, No. CIV.A. 09-02792 SRC, 2011 WL 1327422, at *4 (D.N.J. Apr. 5, 2011). "Impossibility or impracticability is a complete defense to a breach of contract claim where 'a fact essential to performance is assumed by the parties but does not exist at the time of performance.'" *Hill v. Com. Bancorp, Inc.*, No. CIV.09-3685 (RBK/JS), 2010 WL 2539696, at *7 (D.N.J. June 17, 2010) (quoting *Connell v. Parlavecchio*, 255 N.J. Super. 45, 49 (App. Div. 1992)). These defenses apply only in extraordinary circumstances where "performance has become literally impossible, or at least inordinately more difficult, because of the occurrence of a supervening event that was not within the original contemplation of the contracting parties." *JB Pool Mgmt., LLC v. Four Seasons at Smithville Homeowners Ass'n, Inc.*, 431 N.J. Super. 233, 246 (App. Div. 2013). "In other words, the parties must not have reasonably foreseen the change that rendered the contract performance impossible or impracticable." *Petrozzi v. City of Ocean City*, 433 N.J. Super. 290, 303 (App. Div. 2013). Performance may be excused where extraordinary circumstances "make performance [of a contract] so vitally different from what was reasonably to be expected as to alter the essential nature of that performance." *JB Pool*, 431 N.J. Super. at 245.[9]

---

[9]    Importantly, even if the Court were to find performance by the contracted deadline to be impossible – which, for the reasons set forth herein, it does not –

Performance is not excused, however, "where the difficulty is the personal inability of the promisor to perform." *Connell*, 255 N.J. Super. at 49; *see also ETC Int'l, Inc. v. Curriculum Advantage, Inc.*, No. CIVA 03CV5898 (JLL), 2006 WL 1645030, at *9 (D.N.J. June 14, 2006), *aff'd*, 272 F. App'x 139 (3d Cir. 2008) ("The impossibility of the promisor's performance must be objective impossibility, not merely subjective impossibility.") (citing *Duff v. Trenton Beverage Co.*, 4 N.J. 595, 606 (1950)).[10]  It is the difference between "the thing cannot be done" and "I cannot do it." *Fast, Inc. v. Shaner*, 183 F.2d 504, 506 (3d Cir. 1950).

Defendant urges the Court to find a genuine dispute of material fact as to whether its performance was excused due to Plaintiff's change orders, which required Defendant to make changes to the Capping Machine while it was still in progress, order new parts and materials, some of which were on backorder, and generally delayed completion of the machinery.  [Def.'s Opp'n at 2–4.]  But there is no evidence to suggest that change orders and modifications to the Capping Machine were not

---

Defendant would be at most excused from performing under the contract, but Defendant would "not [be] granted an extension of time to meet its construction and delivery obligations," *Armur*, 2011 WL 1327422, at *4, nor would it be entitled "to retain the benefit provided by" Plaintiff, namely the $307,325.00 Deposit.  *Dixon v. Lincoln Univ.*, No. CV 24-1057-KSM, 2024 WL 4156837, at *6 (E.D. Pa. Sept. 10, 2024) (collecting cases).

[10]    Mr. Belts testified regarding certain personal hardships he and his family have endured that made timely performance more difficult.  [*See* Belts. Dep. Tr. 62:7-63:11.]  While the Court is sympathetic, this personal inability to perform does not support a legal defense of impossibility or impracticability.    An extension or other accommodation may very well have been granted by Plaintiff under these trying circumstances, but the record is devoid of any evidence that one had been requested.

contemplated or reasonably foreseen by the parties. Notably, Defendant did not object to any of the changes or request extensions as a result. *See ETC Int'l*, 2006 WL 1645030, at *9 (party who received licenses for which it did not pay and who failed to return licenses or "otherwise attempt to negotiate a new contract" cannot succeed on impossibility defense). What's more, although the Purchase Order and/or subsequent change orders could have made deadlines contingent upon the receipt of new parts or included new deadlines, they did not. *See, e.g.*, *Sullivan as Tr. of Sylvester L. Sullivan Grantor Retained Income Tr. v. Max Spann Real Est. & Auction Co.*, 465 N.J. Super. 243, 264 (App. Div. 2020), *aff'd as modified*, 251 N.J. 45, 276 A.3d 92 (2022) (affirming dismissal of impossibility and impracticability defenses where purchase was not contingent on any factors, noting that party "hoped 'everything was going to work out,' but that does not constitute impossibility of contract performance."); *Connell*, 255 N.J. Super. at 50 (purchaser who did not make performance contingent on obtaining financing could not later avail himself of impossibility defense when he failed to secure financing).

Instead, the record shows that the parties clearly contemplated delays and included financial penalties against Defendant for untimely completion of the Capping Machine in their contract. [Purchase Order at 2.] Additionally, Mr. Belts's own testimony confirms that the parties contemplated an iterative process involving assembling the machine, testing it, and then making changes as needed. [*See, e.g.*, Belts. Dep. Tr. 20:3-20, 90:1-23, 99:1-7, 102:16-103:10.] Changes and some resulting delays were clearly "within the original contemplation of the contracting parties," and

21

do not here give rise to a defense of impossibility or impracticability. *See JB Pool*, 431 N.J. Super. at 246; *see also Armur*, 2011 WL 1327422, at *5 (presence of asbestos could not support impossibility defense where possibility of asbestos was clearly foreseen by the parties).[11]

The Court likewise rejects Defendant's attempt to evade summary judgment by arguing that the effects of the COVID-19 pandemic excused its performance. Defendant contends that staffing shortages and illnesses, as well as global supply chain issues, resulting from the pandemic caused "unavoidable delays" in obtaining the parts needed for the Capping Machine. [Def.'s Opp'n at 3–4.] The Court is well aware of the vast upheaval caused by the COVID-19 pandemic on both a human and an economic level. Yet it is disingenuous to say that the pandemic and its far-reaching impacts were unforeseeable events at the time the parties entered into the Purchase Order in October 2020. At that point, the pandemic was well underway. *MSC Trading, S.A. v. Delgado*, No. 22-20075-CV, 2024 WL 3103942, at *9 (S.D. Fla. May 20, 2024); *Rittvo Inv. Fund LLC 4 v. Pomp & Whimsy, Inc.*, No. 223CV00240APGDJA, 2024 WL 343384, at *2 (D. Nev. Jan. 30, 2024) ("[Defendant] presents no evidence as to when

---

[11]    The Court reiterates that this is not a situation where performance was merely late. The Capping Machine was never delivered at all. In fact, nearly eighteen months after the contracted deadline and thirty-one weeks from the last change order, the Capping Machine – which the parties originally anticipated would take only eighteen to twenty weeks to complete – was still not ready for inspection and shipment. Defendant cannot succeed on its impossibility defense as a matter of law. *See Armur*, 2011 WL 1327422, at *5 (impossibility defense fails as a matter of law where promised premises were still not delivered nineteen weeks past delivery date where party experienced mere eight-week construction delay out of its control).

the supply chain issues relevant to its business arose such that those issues would have been unforeseen at the time of contracting.  I therefore grant the plaintiffs' motion for summary judgment that [defendant] breached the agreements.").  Indeed, the whole purpose of the parties' contractual relationship was to facilitate mass production of hand sanitizer bottles in the wake of the worldwide health crisis.  The economic and health impacts of the pandemic were well known over six months into the crisis and should have been contemplated by the parties.  Since these effects were reasonably foreseeable to the parties, they cannot support a finding of impossibility or impracticability.  *E.g.*, *Petrozzi*, 433 N.J. Super. at 303; *JB Pool*, 431 N.J. Super. at 246; *see also Les Indus. Wipeco, Inc. v. Bluestem Mgmt. Advisors, LLC*, No. 21-2289-JAR-ADM, 2023 WL 4295364, at *12 (D. Kan. June 30, 2023) (rejecting argument that pandemic-related supply chain issues excused late delivery of medical grade gloves where gloves were "order[ed] nearly a year into the COVID-19 pandemic" when "there was extreme demand for PPE [such as gloves] due to the COVID-19 pandemic."); *Martorella v. Rapp*, 2021 WL 3234312, at *4 (Mass. App. Ct. July 30, 2021) ("breaching parties are not entitled to rely on the impossibility defense where they were, or should have been, aware of a particular risk, and proceeded in the face of that risk without negotiating contract terms that might have protected against the risk.").

Even if the parties had not foreseen the effects of the pandemic in October 2020 – which they clearly had – Defendant proffers no more than a scintilla of evidence to support its position.  *MSC Trading*, 2024 WL 3103942, at *9–10.  The only evidence Defendant adduces is Mr. Belts's vague testimony about "world events," "supply

23

chain issues," and personnel illness. [*See, e.g.*, Belts Dep. Tr. 23:24-24:18, 42:4-10, 58:20-24, 59:4-17.] There is no evidence in the record showing how supply chain backlogs and personnel shortages impacted Defendant's ability to perform under the Purchase Agreement. Defendant was responsible for sourcing all parts and components for the Capping Machine [SUMF ¶ 5] yet fails to provide any documentation or other evidence regarding its efforts to do so. Instead, it hides behind bald excuses. But Defendant's general reference to "pandemic-era economics" and staffing shortages alone cannot establish that it was legally impossible for Defendant to complete the Capping Machine, even a year and a half after it was due. *See MSC Trading*, 2024 WL 3103942, at *9–10; *see also Rittvo*, 2024 WL 343384, at *2 (rejecting impossibility defense and granting summary judgment on breach of contract claim where defendant "presents no evidence of what items it was having trouble sourcing . . . or whether that was due to global supply chain issues or other reasons."); *Bussel Realty Corp. v. Franco*, No. A-4274-19, 2021 WL 2326402, at *6 (N.J. Super. Ct. App. Div. June 8, 2021) (affirming refusal to excuse performance under impossibility or impracticability doctrines where defendant claimed "business interruption" caused by COVID-19 pandemic but "provided no information" as to how business was interrupted). Defendant has failed to proffer any evidence suggesting a disputed fact as to its impossibility or impracticability defense. Having rejected Defendant's defenses, the Court finds that there are no genuine disputes of material fact as to Plaintiff's breach of contract claim against Defendant and judgment must be entered against Defendant as a matter of law.

## IV.   CONCLUSION

For the foregoing reasons, the Court will **GRANT** Plaintiff's Motion for Summary Judgment on its breach of contract claim (Count I).   Final judgment shall be entered on the breach of contract claim in favor of Plaintiff and against Defendant in the amount of $501,764.16.   Plaintiff's conversion claim (Count II) is dismissed.[12]   An accompanying Order as of today's date shall issue separately. Fed. R. Civ. P. 58(a).

**s/Renée Marie Bumb**
RENÉE MARIE BUMB
Chief United States District Judge

DATED: <u>December 30, 2024</u>

---

[12]      Count II of the Complaint sets forth a claim for conversion relating to Defendant's failure to return Plaintiff's Deposit.   Nowhere in the summary judgment briefing do the parties address the status of this claim.   The Court dismisses the conversion claim as apparently withdrawn.   If the Court has misunderstood Plaintiff's failure to address the conversion claim in its motion, Plaintiff shall advise the Court by written submission filed on the docket within fourteen days as to the status of the claim and why it was not addressed in the motion for summary judgment.

In any event, given that the Court now grants summary judgment in favor of Plaintiff and against Defendant on Plaintiff's breach of contract claim, including its demand for the return of its Deposit, any possible recovery on this theory of liability would be improperly duplicative of the damages awarded on the breach of contract claim.   *See Coldwell Banker Real Est., LLC v. Bellmarc Grp. LLC*, No. CV 14-7926, 2021 WL 4129492, at *9 (D.N.J. Sept. 9, 2021), *aff'd*, No. 21-2862, 2022 WL 3644183 (3d Cir. Aug. 24, 2022).